**UNITED STATES of America, Appellee,**

v.

**Benny ONG et al., Defendants-Appellants.**

Nos. 1052—1055, Dockets 76–1087, 76–1088, 76–1093 and 76–1094.

United States Court of Appeals, Second Circuit.

Argued May 20, 1976.

Decided Sept. 14, 1976.

Gregory J. Potter, Asst. U. S. Atty., New York City (Robert B. Fiske, Jr., U. S. Atty., S. D. N. Y., Lawrence B. Pedowitz and John C. Sabetta, Asst. U. S. Attys., New York City, on the brief), for appellee.

Daniel Markewich, New York City (Markewich, Rosenhaus, Markewich & Friedman, P. C., New York City, Goldman & Hafetz, New York City, Lawrence S. Goldman and Frederick P. Hafetz, New York City, on the brief), for defendant-appellant Benny Ong.

William C. Herman, New York City (Julia P. Heit, New York City, on the brief), for defendant-appellant Wong Wah.

James A. Cuddihy, New York City, for defendant-appellant Tom Hom.

Gilbert S. Rosenthal, New York City (Julia P. Heit, New York City, on the brief), for defendant-appellant Albert Young.

Before LUMBARD, FRIENDLY and OAKES, Circuit Judges.

LUMBARD, Circuit Judge:

Benny Ong, Wong Wah, Tom Hom and Albert Young appeal from their convictions after a nine-day trial before Judge Brieant in the Southern District and jail sentences imposed on them on February 11, 1976.[1] Ong, Wah and Hom were convicted of par-

---

1. Judge Brieant sentenced defendant Ong to five years imprisonment on Count One, the conspiracy count, and eight years on Counts Two through Sixty-one and Seventy-four through Seventy-eight, all sentences to run concurrently. Wah was sentenced to concurrent terms of three and a half years imprisonment on Count One and on Counts Thirty-five through Sixty-three. Hom was sentenced to concurrent terms of three years imprisonment on Count One and on Counts Sixty-four through Seventy-eight. Young was sentenced to concurrent eighteen month terms of imprisonment on Counts Eighty through Ninety-nine and fined $5000.

ticipating in a conspiracy from October 1973 to July 1974 to bribe criminal investigators of the Immigration and Naturalization Service and numerous counts of bribery on specified dates. Young was convicted on 20 counts of bribery, the court having dismissed the conspiracy count against him at the end of the government's case.

Young complains that as the government did not act in good faith in charging him with membership in the conspiracy which it knew it could not prove, the court should have granted his motions for a severance and later for a mistrial. All the appellants allege that the admission of irrelevant, unduly prejudicial and inflammatory evidence regarding other crimes deprived them of a fair trial. They also assert that improper remarks in the prosecutor's summation deprived them of a fair trial. In addition, appellant Wah complains that the trial judge erroneously curtailed his counsel's cross-examination of INS investigator Lawrence Granelli.

■ As with almost every criminal jury trial which extends over several days and involves multiple defendants, it cannot be said that the record is free from doubt regarding all the rulings on the admission of evidence. But a study of the record in this case, including the transcripts of tape recorded talks with all the defendants relating to bribes and on the occasion of their payment of bribes, leaves us with the strong conviction that the government produced overwhelming proof of the guilt of all the defendants. We view the claims of error accordingly and consider the possible effects of any errors to be less serious than we would if the case against all or any one of the defendants could be considered to be a close question. As we conclude beyond a reasonable doubt that contrary rulings on all the matters of which the appellants complain would still have resulted in the verdicts returned by the jury, we affirm all the convictions. Cf. *Brown v. United States*, 411 U.S. 223, 231–32, 93 S.Ct. 1565, 36 L.Ed.2d 208 (1973).

In October 1973, all four appellants were in the business of running separate gam-

bling houses in Chinatown in Manhattan's lower East Side. Ong was the secretary of the Hop Sing Association, with a branch at 16 Pell Street. Wah was the secretary of the Tai Look Association at 58 East Broadway. Hom managed a place at 22 Pell Street. Young ran the Tsung Tsin Association at 1 Catherine Street. The record discloses that these gambling houses relied heavily on the patronage of illegal aliens.

On October 14, 1973, Ong saw INS investigators Granelli and Brattlie in Pell Street and beckoned them to join him. Ong told the agents he wanted gambling house people to meet with INS officials to make arrangements for checking illegal aliens in the gambling houses. The agents said they would have to speak to their supervisor.

Granelli thereafter spoke to his supervisor, who suggested the negotiations continue. That evening, Granelli and a new partner, Investigator James Kibble, met with Ong who told them that he knew of at least eight gambling houses that would each pay $200 per week in exchange for advance notice of INS visits. After this conversation was reported to the INS supervisor the matter was referred to the FBI where Special Agent Henry was charged with the investigation.

Agent Henry obtained the approval from the Department of Justice for use of recording equipment by Granelli and Kibble in their subsequent meetings with Ong and the other defendants. From November 15 on, most of the meetings and telephone conversations between the investigators and the defendants were recorded, and the tapes were introduced into evidence at the trial. It was through use of these tapes and the testimony of the investigators relating what had transpired at unrecorded meetings that the government implicated all the defendants in the bribery scheme.

Granelli and Kibble testified that on November 6, 1973, they met with Ong to express interest in his offer on behalf of their boss. Later the same evening, the investigators were admitted to the Tai Look basement gambling house by Wong Wah. Wah permitted the investigators to search for

illegal aliens and then informed Kibble that he, Wah, had been called by Benny Ong.

On November 8, the investigators again met Ong who told them that some of the gambling house operators had objected to paying as much as $200 per week. However, Ong offered to make payments in that amount for himself, the Catherine Street houses, some of which were allegedly run by defendant Young, and the 58 East Broadway house, which was run by defendant Wong Wah. During this conversation, the investigators expressed anger that Wah approached Kibble and mentioned that Ong had called him. Ong agreed to speak to Wah to prevent future public mention of Ong's name.

The next week the investigators called Ong to arrange a meeting for the first payoff. Ong was accompanied at the subsequent meeting by Wah, and they each gave the investigators $200. Another $400 payment was made at a meeting the following week, during which Ong suggested that the investigators raid the Catherine Street houses which had refused to make payment.

Payments from Ong continued throughout November and into December. During the meetings at which the payments were made, Ong boasted of his cordial relations with New York City police officials and stated that he had been giving money and gratuities to them for several years. He also expressed displeasure with the Catherine Street gambling operators for not making payments and in particular derided defendant Young, who allegedly owed Ong $5000 for a previous payment made to other police officials on Young's behalf.

On December 12, 1973, Granelli and Kibble drove past 1 Catherine Street looking for illegal aliens when defendant Young motioned to them. In the ensuing conversation, Young told the investigators that he knew of their deal with Ong and that he wanted to make a similar arrangement. The investigators agreed to meet with Young the following day. At the scheduled meeting, Young offered the investigators $200 per week to prevent any raids on his gambling house. Young also requested that Ong not be told of the arrangement.

At a subsequent meeting with the investigators, however, Ong informed them that he knew Young was making payments and wanted to know the amount. Ong suggested that they increase the amount charged to Young and reminded the investigators of Young's previous $5000 delinquency.

Payments to the investigators on behalf of Ong, Wah and Young continued into January 1974. On January 17, the investigators informed Ong that a man had approached two other INS investigators outside 61 Mott Street and offered to take them to see Benny Ong and to pay them money in order to prevent unexpected raids on a Mott Street gambling house. The agents had reported the incident to the supervisor who was aware of Granelli and Kibble's undercover exploits, and Granelli and Kibble complained to Ong that had the other agents reported the incident elsewhere, trouble would have resulted. Ong said that he knew the identity of the malefactor and would speak to him.

Ong later introduced the man, identified as the defendant Tom Hom, to Granelli and Kibble and informed them that Hom wanted the same deal that had been arranged with Ong and Wah. This offer was accepted and all defendants made weekly payments throughout the remainder of the period charged in the indictment, except for brief periods when Wah and Young temporarily went out of the gambling business.

Following arrests by officers associated with Special State Prosecutor Maurice Nadjari in March 1974, Wah and Hom refused to deal directly with Granelli and Kibble and all payments to the investigators on behalf of these two defendants were made by Ong. At an April 7, 1974 meeting, Ong informed the investigators that he had been arrested by police from Nadjari's office after other officers had confessed that they had accepted bribes from Ong. On July 18, 1974, the defendants were arrested for bribing INS investigators. By that time, Granelli and Kibble had received $6000 from Benny Ong, $3000 from Tom Hom, $6200

from Wong Wah, and $5000 from Albert Young.

At the close of the government's case, Judge Brieant dismissed the conspiracy count with respect to defendant Young. The judge refused, however, to grant Young's motion for a severance.

The making of the payments was not denied as none of the defendants took the stand. The defense was that they were coerced by the investigators into making payments and had to comply with the extortionate demands to prevent destruction of their gambling operations. Defense counsel also argued that gambling was part of an accepted life style in Chinatown and that a long history of discrimination against Chinese in the United States made them especially susceptible to the threats and demands of police and other officials. In its charge, the court instructed the jury that they could consider evidence of coercion in determining whether defendants possessed the requisite intent to bribe.

### The Claim of Multiple Conspiracies

Hom contends that Judge Brieant's charge on the conspiracy count failed to indicate satisfactorily that if the jury found multiple conspiracies among the defendants rather than a single conspiracy as charged in the indictment, they would have to acquit on the conspiracy count. Hom also claims that the judge should have charged that participation in one conspiracy of many did not constitute participation in a single overall conspiracy. We find these claims to be wholly without merit.

 Sufficient evidence was adduced at trial to allow the jury to conclude beyond a reasonable doubt that Ong, Wah and Hom knew of the existence of other members of a joint plan and that each was aware that his arrangements with the investigators had been made in concert with arrangements for other gambling house operators.[2] See *United States v. Bernstein*, 533 F.2d 775, 793 (2d Cir. 1976); *United States v.*

*Manarite*, 448 F.2d 583, 589 (2d Cir.), cert. denied, 404 U.S. 947, 92 S.Ct. 281, 30 L.Ed.2d 264 (1971). Specifically, there was testimony that Hom had approached INS agents with respect to making payments to avoid unexpected raids and had mentioned Ong's name in connection with a payoff scheme. On several occasions, meetings at which payments were made were attended by more than one conspirator, and on other occasions, Ong, Wah and Hom appeared separately within minutes of each other to pay the investigators. After the March 1974 arrests by officers assigned to Special Prosecutor Nadjari, Ong made several payments for the houses of Wah and Hom.

Not only was the evidence sufficient to allow the jury to infer that each conspirator knew of his participation in a broad scheme, but Judge Brieant actually instructed the jury that such a determination must be made and that proof of separate conspiracies would not support a conviction. We therefore find no basis for complaint in the instruction.

### Young's Motion for a Severance

Eight months before the trial began, defendant Young moved for a dismissal of the conspiracy count against him and a severance of his case. Young claimed that transcripts of the tape recorded meetings between various defendants and the INS investigators conclusively demonstrated that no conspiracy ever existed among Young and his codefendants. Young stressed that the transcripts revealed that there was great animosity between him and Ong and that each indicated a desire to avoid any business dealings with each other. In particular, several of the transcripts contained derogatory comments about Young made by Ong, including warnings to Granelli and Kibble that Young could not be trusted. Young maintained that if the conspiracy charge was dismissed, his case should be severed to avoid his being unduly preju-

---

2. Indeed, in his brief on this appeal, Wong Wah concedes that Hom and Wah were aware that each was making payments.

diced by a spillover effect of any evidence introduced at trial of those defendants who had participated in the conspiracy. Judge Brieant denied Young's motion on the basis of the government's representations of what it would prove at trial regarding Young's connections with the other defendants.

At the conclusion of the government's case, however, Judge Brieant dismissed the conspiracy count against Young on the ground that no reasonable juror could infer from the evidence actually adduced that Young had taken part in the conspiracy charged. Nevertheless, the judge refused to sever Young's case. He determined that most of the evidence that had been theretofore introduced against the other defendants concerning the existence and object of the conspiracy would also be admissible at a separate trial of Young since he had made reference to the other conspirators in conversations with the INS investigators. Young unsuccessfully moved to set aside the verdict on the ground that the court erred in denying the severance. On this appeal, Young renews the same claim. We affirm the district court.

▆▆ . Once defendants have been properly joined under Fed.R.Crim.P. 8(b), dismissal of the count justifying the joinder will require severance of the remaining counts only if the defendant will be prejudiced by the joinder or if the count dismissed was not alleged by the government in good faith, i. e., with reasonable expectation that sufficient proof will be forthcoming at trial. *United States v. Aiken*, 373 F.2d 294, 299 (2d Cir.), cert. denied, 389 U.S. 833, 88 S.Ct. 32, 19 L.Ed.2d 93 (1967).

The government's proof was based almost entirely on testimony elicited from the INS investigators and the tapes of conversations with the defendants. Thus, the government knew well in advance what evidence it would be able to introduce at trial. The government was aware that while Ong had initially indicated that he spoke for eight gambling houses, including those on Catherine Street allegedly operated by Young, this hearsay boast was never corroborated by payments through Ong from any houses other than those operated by Wah and Hom. Furthermore, the government ostensibly knew that the tapes revealed antagonism and distrust between Ong and Young that would have impaired any relationship conducive to the success of the conspiracy. Clearly the government cannot have acted in good faith unless it had a reasonable expectation that it could prove Young's participation in the conspiracy despite this contrary evidence. We find that the government's case, albeit based on a novel and questionable theory of conspiracy, satisfied this standard.

From the time the government first learned of Young's objection to his inclusion in the conspiracy count, it has maintained that the mutual interest and awareness by Young and Ong in each other's negotiations with INS investigators was sufficient to charge them with participation in a single conspiracy despite the absence of any concerted action between these defendants. The government has consistently contended that the mere knowledge of all defendants that there existed a scheme to bribe investigators, conjoined with individual acts of each defendant to ensure the success of his part of the common design, satisfied the elements of the conspiracy charged. It is apparently the government's claim that since each defendant would benefit not only from his individual arrangement with INS officials, but also from the cumulative decrease in successful raids in Chinatown gambling houses, a tacit unlawful agreement could be inferred even where there was no evidence of direct communication about the matter with Young. Cf. *United States v. Cogan*, 266 F.Supp. 374, 377–78 (S.D.N.Y.1967).

The novelty of such a theory is evidenced by the fact that the government's primary support for its proposition is an extract of a Canadian case, *Rex v. Meyrick and Ribuffi*, 21 Crim.App.R. 94 (1929), in which the court found a single conspiracy where two nightclub proprietors offered bribes to a police

officer individually, but in the knowledge that the other was doing likewise.[3]

■ We may not agree that the law of conspiracy should be extended so far. See *United States v. Bufalino*, 285 F.2d 408 (2d Cir. 1960). We do not, however, equate novelty or even error with bad faith. In the absence of proof that the government's theory was frivolous or clearly rejected by recent precedent of which it was or should have been aware, we will not find that an argument has been prompted by bad faith simply because it is unsuccessful.

■ We cannot, however, agree that Young's joinder with the other defendants was free from prejudice. As Judge Brieant stated, Young's mention of Ong's arrangement with INS investigators may have allowed the government to introduce into evidence at a separate trial of Young the outlines of the conspiracy proven at this trial. It is improbable, however, that the evidence concerning the nefarious reputation of Ong or any mention of the subjects presently complained of and discussed infra would have played any role in a trial of Young alone. Nor is it likely that the government would have been permitted to introduce the multitude of tapes concerning solely the other defendants in which they literally convicted themselves out of their own mouths. These facts, when added to the prejudice inherent in any multi-defendant trial, make it possible that Young's relationship to the other defendants, by reason of his physical presence in the courtroom, injected an element of guilt by association into the jury's deliberations. See *United States v. Branker*, 395 F.2d 881, 887–89 (2d Cir. 1968), cert. denied, 393 U.S. 1029, 89 S.Ct. 639, 21 L.Ed.2d 573 (1969); cf. *United States v. Kompinski*, 373 F.2d 429 (2d Cir. 1967).

■ Our conclusion that Young should have been given a separate trial to avoid undue prejudice does not automatically re-quire reversal. An error that affects no substantial rights of the defendant is thereby rendered harmless and does not constitute grounds for relief. Fed.R.Crim.P. 52(a). Harmlessness is a relative term that requires specific definition in each case by determining the effect on the jury's verdict of the error's absence. See *Chapman v. California*, 386 U.S. 18, 22–23, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967); *Kotteakos v. United States*, 328 U.S. 750, 762, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946). Thus, where untainted evidence of guilt is substantial, a greater demonstration of prejudice resulting from an erroneous failure to sever must be made before the error will be considered to require reversal. See *Loftis v. Beto*, 450 F.2d 599 (5th Cir. 1971) (denial of severance after codefendant confessed was harmless error where evidence of defendant's guilt was overwhelming and no reasonable jury could have reached a different result at a severed trial). Cf. *United States ex rel. Ross v. LaVallee*, 448 F.2d 552, 554 (2d Cir. 1971).

No evidence could be more inculpatory than the tapes heard by the jury of meetings at which Young arranged to make payments to Granelli and Kibble, and later meetings at which payments were actually made. Young never denied making the payments, but only joined the other defendants in their attempt to establish the defense of coercion. Little evidence was introduced to support this theory of coercion and it was contradicted in Young's case by his suggestion to the investigators of illegal means by which they could make more money. Given this record, we are convinced beyond a reasonable doubt that the jury would have reached the same verdict had Young been tried separately and therefore that his trial with the other codefendants was harmless error. See *United States v. Glasser*, 443 F.2d 994, 1003 (2d Cir.), cert. denied, 404 U.S. 854, 92 S.Ct. 96, 30 L.Ed.2d 95 (1971).

---

**3.** If the government proffered an acceptable theory of conspiracy law, it would not be rendered less viable by a display of animosity among conspirators. See *United States v. Tramunti*, 513 F.2d 1087, 1106–07 n. 23 (2d Cir.), cert. denied, 423 U.S. 832, 96 S.Ct. 54, 46 L.Ed.2d 50 (1975); *United States v. Mallah*, 503 F.2d 971, 980 (2d Cir. 1974), cert. denied, 420 U.S. 995, 95 S.Ct. 1425, 43 L.Ed.2d 671 (1975).

### Inadmissible Evidence on the Tapes

Ong maintains that throughout the trial the prosecution interjected reference to his activities that were irrelevant to the charges and that these references were so prejudicial and inflammatory as to deprive him of a fair trial. Although the activities mentioned were often those of Ong alone, the other defendants claim that the improper references pervaded the trial and prevented the jury from rendering a verdict based solely on the evidence of bribery properly before them.

█ It is, of course, desirable in any criminal trial to keep from the jury any evidence of malfeasance by the defendants not related to the charges at issue. See *United States v. Tomaiolo*, 249 F.2d 683 (2d Cir. 1957). Nevertheless, we find that any reference to such activities was made with the prior knowledge of the defendants and, in the face of the massive evidence of guilt on the bribery and conspiracy charges, was unlikely materially to influence the jury.

The question of unrelated information on the tapes was brought to the district court's attention at least four months before the trial. At that time, Ong's attorney informed the court that the copies of tapes that he had already obtained included potentially inflammatory and prejudicial material that might require redaction. The judge expressed a willingness to redact or give precautionary instructions with respect to such material, but in the course of the conference he informed counsel that he wanted to know of motions "with respect to the tapes or the transcripts" prior to trial to avoid interruption of testimony to deal with evidentiary problems. No such relief was sought before trial. Nevertheless, during the early stages of the trial, the court was sufficiently concerned about claims of prejudicial material on the tapes that it did interrupt the trial to hold a hearing with the result that some material was redacted.

Defendants maintain, however, that some inflammatory material still found its way into evidence. The most serious of these contentions is that some recordings implied that Ong and Wah were familiar with illegal narcotics traffic. The jury was permitted to hear a conversation of January 23, 1974 in which Ong informed the INS investigators that "two pounds" of "white stuff" had been taken from a local barber shop. In response to the investigators' questioning, Ong recited the value of the narcotics and revealed where they had been hidden. He also told the investigators that his knowledge was limited because "I don't do that no more." The court refused to redact this tape on the ground that it only related "local news," was not prejudicial, and demonstrated the close relationship between Ong and the investigators.[4]

The jury also heard a conversation of February 6, 1974 wherein Ong and Wah discussed the price of a kilo of heroin in which Granelli had expressed an interest. The conversation was interrupted when Ong, seeing the approach of Hom, warned the others not to discuss heroin in the presence of the co-conspirator. When Hom left, Ong advised Wah in Chinese not to become involved in the proposed narcotics deal and then informed the investigator that he was too old to get involved in such dealings. The district court determined that this conversation did not implicate any defendant in any wrongdoing unrelated to the charges being tried and thus refused to redact it.

█ These conversations were not wholly irrelevant to the issues being tried in the case and thus the district court had discretion to determine whether the probative value of the conversations was outweighed by their prejudicial nature. *United States v. Catalano*, 491 F.2d 268 (2d Cir.), cert. denied, 419 U.S. 825, 95 S.Ct. 42, 42 L.Ed.2d 48 (1974); Fed.R.Evid. 403. Although ordinarily there are few subjects more potentially inflammatory than narcot-

---

4. The trial judge also determined that the rule of completeness required introduction of the entire transcript to prevent mutilation of the conversation that would make it unusable. As we have determined that the conversation was admissible on other grounds, we need not determine whether the rule of completeness applied to this situation.

ics and thus such evidence should usually be excluded in a non-narcotics trial, we believe that in the total circumstances of this case, the trial judge did not abuse his discretion in admitting the challenged conversations.

Defense counsel had argued in their opening statements that any payments made by defendants were coerced by the immigration officers' threats to close the gambling operations on which defendants were financially dependent. The conversations in which the parties openly discussed illegal operations in the neighborhood and the possibility of obtaining narcotics were probative of the prosecution's retort that cordial relations among the parties belied the theory of coercion. See *United States v. Cockerham*, 155 U.S.App.D.C. 97, 476 F.2d 542, 545 (1973). Defendants have not cited any other conversations that would have demonstrated congeniality among the parties without including some references to illicit activities. Moreover, the reference to narcotics in this case did not inculpate any defendant in ongoing illegal transactions. As Judge Brieant noted, it was possible to infer from all these conversations only that defendants, especially Ong, were aware that various narcotics transactions occurred in Chinatown. It was neither inevitable nor probable that the jury would infer involvement of any of the defendants from that knowledge. Thus, even though the conversations involved volatile material not directly connected with the instant indictment, they could be admitted to prove the guilt of defendants under that indictment. See *United States v. Chapin*, 169 U.S.App.D.C. 303, 515 F.2d 1274, 1284, cert. denied, 423 U.S. 1015, 96 S.Ct. 449, 46 L.Ed.2d 387 (1975).

Moreover, we believe that the defendants' dilatoriness in bringing the challenged references to the attention of the district court indicates that before the trial they did not consider mention of other illicit activities to be as prejudicial as they now claim. Counsel for Ong maintains that he understood Judge Brieant's request for pre-trial motions to pertain only to motions for corrected, additional or alternative transcripts and not to motions for redaction. This interpretation of the judge's ruling, however, is contrary to common sense, especially in light of the court's constant expression at the pre-trial hearing of a desire to try the case unimpeded by collateral issues.

In any event, as discussed above with respect to Young's claim for severance, the overwhelming proof against defendants placed upon them a heavy burden to demonstrate that any substantial rights were adversely affected by the rulings of the court. We do not believe that that burden was satisfied by the introduction of conversations involving narcotics. Since those conversations revealed awareness of rather than involvement in narcotics activities and since the trial judge persistently admonished the jury that traffic in narcotics was irrelevant to the issues before them, we believe beyond a reasonable doubt that the jury found the defendants guilty on the basis of the substantial evidence of bribery and conspiracy without considering any other illegal acts. See *United States v. Williams*, 523 F.2d 407 (2d Cir. 1975); *United States v. Bell*, 500 F.2d 1287 (2d Cir. 1974).[5]

█ The tapes also reveal Ong's warnings to Granelli and Kibble not to let Young fall behind in his payments because the latter was untrustworthy, exemplified by the assertion that Young had never repaid a $5000 payment made to police officers by Ong on Young's behalf. Although this statement clearly was hearsay with respect to Young, we do not believe that he suf-

---

5. The same rationale applies to other instances in which allegedly inflammatory material was not redacted. Statements by Ong that he had given bribes or gratuities to other police officers for many years and had been arrested by officers under the jurisdiction of Special Prosecutor Nadjari were made in furtherance of the conspiracy and were related to the issues before the jury. Thus the judge was entitled to weigh their probative value against the possibility of prejudice. In light of the overwhelming evidence of guilt and the failure of defense counsel to make timely motions to omit these allegedly prejudicial references, we cannot say that the court abused its discretion in admitting into evidence the tapes and transcripts of or testimony about conversations containing these statements.

fered any prejudice from its admission into evidence sufficient to require reversal.

The court initially allowed the government to elicit testimony concerning the $5000 payment on the ground that it might show the animosity between Young and Ong and thus be exculpatory of Young on the conspiracy count. However, the court immediately advised the jury that the conversation could not be considered with respect to Wah or Hom. The court later instructed the jury that it could not consider Ong's statement in determining whether Young had ever previously engaged in any act of bribery. The judge did, however, permit the jury to consider with respect to Ong the fact of his having made the statement.

These rulings, which were repeated during the court's charge to the jury, placed Ong's story of the $5000 payment into proper perspective for the jury. They allowed the jury to consider Ong's animosity towards Young without inculpating the latter in an unverified scheme. Given these instructions, we find beyond a reasonable doubt that the jury convicted Young solely on the basis of the evidence properly introduced against him. Cf. *United States v. Light*, 394 F.2d 908 (2d Cir. 1968).

### Curtailment of Wah's Cross-Examination

■ As discussed above, despite expressions of concern about the mention of narcotics, references to that issue were injected during Granelli's testimony. After the government completed its direct examination of the INS investigator, the subject of narcotics was addressed directly by Wah's counsel, Mr. Herman. In his cross-examination, Herman asked Granelli if he had tried to involve Wah in a narcotics deal. When the court sustained an objection to this question, Herman responded by asking Granelli if he had requested of Ong whether Wah would deal in narcotics. The court sustained an objection to this question, instructed the jury about drawing any inference from the question, and cautioned Herman to avoid this area of interrogation. After Herman was denied a side bar conference, he asked Granelli if he had told Ong that he, Granelli, "had people who were eager to get narcotics" from Wah. Judge Brieant immediately directed Herman to take his seat and his cross-examination of Granelli ceased.

Wah now renews his claim, initially made at a post-trial hearing, that limitation of his cross-examination of Granelli deprived him of his Sixth Amendment right to confront witnesses against him. Wah claims that the issue of narcotics had been introduced on direct testimony and was therefore a proper subject for cross-examination, especially to allay any suggestion that he was involved in narcotics. He further contends that the untimely curtailment prevented perusal of other areas of cross-examination and prevented the eliciting of testimony relevant to his defense. We find all these claims to be without merit.

We have already discussed the extent to which narcotics had been mentioned in connection with Granelli's direct testimony. These references did not directly link any of the defendants with ongoing illicit activity but merely demonstrated a relationship among the parties to the conversation. Thus, Wah was not harmed by the court's refusal to allow the cross-examination insofar as he would have attempted only to rebut a supposed inference of his involvement in narcotics. See *United States v. Green*, 523 F.2d 229, 237 (2d Cir. 1975), cert. denied, 423 U.S. 1074, 96 S.Ct. 858, 47 L.Ed.2d 84 (1976).

Nor did the order to cease cross-examination after repeated disregard of the court's rulings unduly prevent Wah's effective investigation into other legitimate areas. We have not been apprised of those areas which were not adequately covered by Herman prior to cessation of his cross-examination or by other counsel. Indeed, at the close of redirect examination, the judge asked all defense counsel individually if they had any further questions. Counsel for Wah replied that he had none. During the post-trial hearing at which Wah first presented this claim, counsel indicated that he would have liked to cross-examine with respect to a

conversation between Wah and Kibble that Granelli testified to having overheard. Wah, however, not only failed to address this matter on recross, but also failed to question Kibble, who followed Granelli to the stand, about the conversation. We therefore conclude that the court's curtailment of Wah's examination did not impermissibly preclude inquiry into other subjects.

Finally, we do not agree that the court's order prevented the jury from having "the benefit of the defense theory before them" by denying a defendant "the effective cross-examination . . . of an adverse witness." *Davis v. Alaska*, 415 U.S. 308, 317, 319–20, 94 S.Ct. 1105, 1112, 39 L.Ed.2d 347 (1974). In *Davis*, the Supreme Court ensured a criminal defendant of the right under the confrontation clause of the Sixth Amendment to explore through cross-examination the partiality and motivation of a government witness. 415 U.S. at 316, 94 S.Ct. 1105. Given the defense theory that the INS investigators had initiated the requests for payment, evidence of coercion by the witness would have been most proper. Wah claims that his questions properly attempted to contribute to this theory by demonstrating that the INS officers were attempting to coerce defendants into a narcotics scheme, from which the jury could have inferred an attempt to coerce defendants into a bribery scheme as well. The basis for these questions was the tape of the February 6 conversation in which Granelli inquired about obtaining drugs from Wah. We find that Wah's argument that he wanted to show coercion in the narcotics context is too remote and speculative in the face of the complete absence of any evidence of coercion in the conversation. Moreover, it is hard to believe that the INS investigator wearing the recorder would have thus inculpated himself in an illegal scheme. We do not believe that the Court in *Davis* meant to sanction speculative expeditions into areas only tangentially related to the facts in issue in the hope that some basis for implying an ulterior motive might be found.

Moreover, the total cross-examination was sufficient to afford the jury a basis to evaluate the defense theory. Defense counsel preceding Wah's counsel had questioned Granelli at length about his relationship with defendants in an attempt to prove that he had demanded and accepted payments long before the time covered in the indictment. The same theory was argued to the jury in the opening and closing statements of defense counsel, and the judge instructed the jury with respect to that defense. Under these circumstances the curtailment of Wah's cross-examination did not deprive him of any right of confrontation.

## The Government's Summation

The defendants also urge that improprieties and errors in the prosecutor's summation and rebuttal deprived them of a fair trial, so that their convictions should be reversed.[6] We disagree.

In view of the defense insinuated by the cross-examination of the government's witnesses and argued to the jury in the summation of counsel, we find nothing in the summation and rebuttal of the prosecutor which was not warranted by the evidence. All the prosecutor's arguments which were of doubtful propriety were adequately and immediately corrected by the trial judge upon objections of counsel. The other matters now complained of do not warrant objections of appeal and surely did not seem to defense counsel to warrant objection at the time. Although under certain circumstances—as where the trial judge repeatedly brushes aside valid objections—we do not expect counsel to continue to make objections before the jury, here the trial judge responded effectively to all the defense objections during the summation. In such a case, we give little weight to the

---

6. We note that while the appellants complain of statements made by the prosecutor in his rebuttal argument, the appellants have failed to provide the court in their appendix with copies of their own summation. In such cases obviously the court ought to be provided with copies of the summations to which the rebuttal of the prosecutor was addressed.

matters later complained of for the first time on appeal. *United States v. Briggs*, 457 F.2d 908, 911–12 (2d Cir.), cert. denied, 409 U.S. 986, 93 S.Ct. 337, 34 L.Ed.2d 251 (1972); *United States v. Perez*, 426 F.2d 1073, 1081 (2d Cir. 1970), aff'd, 402 U.S. 146, 91 S.Ct. 1357, 28 L.Ed.2d 686 (1971); *United States v. Indiviglio*, 352 F.2d 276, 280 (2d Cir. 1965), cert. denied, 383 U.S. 907, 86 S.Ct. 887, 15 L.Ed.2d 663 (1966).

We find only one instance which is even worthy of comment. During the government's rebuttal, the Assistant United States Attorney characterized Ong as "Chinatown's chief corrupter for twenty years." Ong maintains that this description of him in the hierarchy of corruption was unsupported by the evidence and suggested to the jury that the government held information not introduced at trial that implicated Ong in other crimes. Ong does not claim that the accusation that he engaged in illicit activities over an extensive period of time is itself inaccurate, since the tapes received in evidence revealed that he bragged of having bribed police officers and having supplied them with additional gratuities long before meeting Granelli and Kibble.

However prejudicial this characterization may now appear, no objection was made at trial. Perhaps this was because the statement was made parenthetically in the course of an argument concerning a wholly unrelated matter and thus was unlikely to be noticed even by an attentive listener. Moreover, we see no reason to believe that the addition of an adjective that exaggerated Ong's otherwise conceded illicit activity would in itself constitute reversible error. In *United States v. Gonzales*, 488 F.2d 833 (2d Cir. 1973), and *Hall v. United States*, 419 F.2d 582 (5th Cir. 1969), cited by Ong as cases in which prejudicial characterizations required reversal, the appellation complained of was combined with additional and persistent errors on the part of the prosecuting attorney or the district court. In neither case did the appellate court hold that the improper characterization alone was a basis for reversal. See *United States v. Guidarelli*, 318 F.2d 523 (2d Cir.), cert.

denied, 375 U.S. 828, 84 S.Ct. 72, 11 L.Ed.2d 60 (1963). In light of the overwhelming evidence against Ong, see *United States v. Benter*, 457 F.2d 1174, 1178 (2d Cir.), cert. denied, 409 U.S. 842, 93 S.Ct. 41, 34 L.Ed.2d 82 (1972), we find beyond a reasonable doubt that the placement of Ong at the pinnacle of corruption in Chinatown could not by itself or combined with any other error have had the effect of improperly prejudicing the defendant.

We therefore conclude that none of the prosecutor's comments, singly or cumulatively, had the effect of depriving any of the defendants of a fair trial.

Convictions affirmed.