**Frank BERARD**

v.

**Kent STONEMAN, Commissioner of Corrections.**

**Civ. A. No. 76–199.**

United States District Court, D. Vermont.

March 8, 1977.

Peter F. Langrock, Langrock & Sperry, Middlebury, Vt., for petitioner.

William T. Keefe, Asst. Atty. Gen., Montpelier, Vt., for respondent.

## MEMORANDUM AND ORDER

HOLDEN, Chief Judge.

The petitioner, Frank J. Berard, Jr., has made application for writ of habeas corpus, under 28 U.S.C. § 2254, to obtain relief from confinement pursuant to a judgment of a state court. On January 19, 1973, after a trial by jury in the Windsor County Superior Court, the petitioner was found guilty of first degree murder for the killing of Raymond Lestage. He was sentenced to life imprisonment at the state prison. He appealed the conviction to the Vermont Supreme Court, challenging the trial judge's admission of evidence of prior homicides allegedly committed by the plaintiff, the restriction of cross-examination of Linda Badore, one of the chief prosecution witnesses and the exclusion of Ms. Badore's state hospital records. The Vermont Supreme Court rejected the petitioner's contentions and found that the trial judge did not abuse his discretion with regard to either the evidentiary rulings or the scope of cross-examination. *State v. Berard*, 132 Vt. 138, 315 A.2d 501 (1974). The petitioner's application for a writ of certiorari to the United States Supreme Court was denied. *Berard v. Vermont*, 417 U.S. 950, 94 S.Ct. 3078, 41 L.Ed.2d 671 (1974). Petitioner then applied to the Windsor County Superior Court for a new trial on the grounds of the existence of newly discovered evidence and the State's use of perjured testimony at the trial. This motion was denied. (Docket No. C2–72WrCr). This denial was appealed and approved by the Vermont Supreme Court. *State v. Berard*, 134 Vt. 220, 356 A.2d 514 (1976). Petitioner also had brought a petition for a writ of habeas corpus in the Windsor County Superior Court, claiming a violation of his constitutional rights in the conduct of the grand jury proceedings. This petition was denied and the dismissal was affirmed on appeal. *Berard v. Moeykens*, 132 Vt. 597, 326 A.2d 166 (1974).

Petitioner then filed an application for a writ of habeas corpus in the U.S. District Court for the District of Vermont. This

application was subsequently dismissed without prejudice on October 16, 1975, for the reason that the petitioner was in escape status when the case was called for hearing. *Berard v. Davallou*, Docket No. 74–211. The present application for a writ of habeas corpus was filed after the petitioner was returned to state custody. On January 3, 1977, an evidentiary hearing was held. By agreement of the parties, the case was submitted on the transcript in the State murder trial and written and oral arguments of counsel.

The petitioner alleges that his Sixth Amendment right to confrontation of witnesses was violated by the trial judge's restriction of his cross-examination of Linda Badore. Specifically, he claims that he should have been able to question Ms. Badore further on her residence since the murder, possible protective custody by the police since the murder, fears she might have had concerning the police separating her from her child, plans to publish a lengthy statement concerning the Lestage murder and, finally, any threats by armed persons made against her, false accusations made by her and fantasies experienced in the past concerning her involvement in criminal activity.

The transcript presented to this court establishes that Lestage was murdered by the petitioner and one Raymond Rebideau in the early morning hours of August 13, 1972, during the course of a purported journey from Burlington, Vermont to Boston, Massachusetts. Lestage had accepted Berard's offer of a ride to that destination in the company of Rebideau and Badore. Rebideau's separate trial and conviction is reported in *State of Vermont v. Rebideau*, 132 Vt. 445, 321 A.2d 58 (1974).

Of those present at the scene of the crime, only Mrs. Badore testified at the petitioner's trial. Her direct examination commenced on the morning of January 12, 1973 and was concluded at mid-afternoon. Cross-examination of this witness continued for the remainder of the day; it was resumed on January 13 and concluded on January 15, 1973, being interrupted only by the Sunday recess on January 14. The cross-examination is reported in 260 pages of transcript. In a most thorough and searching inquiry, defense counsel competently resorted to pretrial testimony given by the witness at an inquest conducted before a district judge, pursuant to 13 V.S.A. §§ 5101 *et seq.*, a deposition taken at the instance of the defendant pursuant to V.R. Cr.P. 15, testimony presented by the witness to the grand jury and an extensive written statement made by Mrs. Badore to Sgt. Richard A. Spear of the Vermont State Police.

■ Needless to say, in this context of the record, the petitioner does not urge that his right to confront Linda Badore was denied, as in *Pointer v. Texas*, 380 U.S. 400, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965). His attack is directed to the trial court's exclusion of specific questions in certain aspects of his inquiry and, in this, he places determinant reliance on *Davis v. Alaska*, 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974), which was decided subsequent to petitioner's trial and the decision of the Supreme Court of Vermont which affirmed the conviction. *State v. Berard, supra*, 132 Vt. at 148, 315 A.2d 501 *et seq.*[1]

The question decided in the affirmative in *Davis* was—"whether the Confrontation Clause requires that a defendant in a criminal case be allowed to impeach the credibility of a prosecution witness by cross-examination directed at possible bias deriving from the witness' probationary status as a juvenile delinquent when such an impeachment would conflict with a State's asserted interest in preserving the confidentiality of

---

1. The respondent filed a memorandum of law to support its position that *Davis v. Alaska* should not have retroactive application. The court is differently persuaded by *Berger v. California*, 393 U.S. 314, 315, 89 S.Ct. 540, 21 L.Ed.2d 508 (1969) which gave full retroactive application to *Barber v. Page*, 390 U.S. 719, 88 S.Ct. 1318, 20 L.Ed.2d 255 (1968). *Berger* and *Barber* both concerned federal habeas corpus applications, claiming denial of constitutional right of confrontation. Accordingly, this court, in considering the merits of the present petition, applies *Davis* with retroactive effect.

juvenile adjudications of delinquency." *Davis v. Alaska, supra*, 415 U.S. 308 at 309, 94 S.Ct. 1105 at 1107.

The petitioner contends his right of confrontation was impermissibly restricted on questions relating to the witness Badore's bias, her possible prejudice and her credibility. His claim relates to four different areas of inquiry.

*Protective Custody of Witness Badore*

■ His first claim is that he was denied the opportunity to establish that Mrs. Badore was in protective custody from August 18, 1972 to the time of trial. Defense counsel, early in cross-examination, inquired of the witness—"Since the 18th of August of this year (sic) where have you been living?" The State's objection to the question was sustained. However, a few questions later counsel became more specific:

Q. Have you been in the custody of police officers continuously since the 18th of August?

A. Yes.

The information was repeated later in the examination. Earlier in the trial Sargeant Richard A. Spear, of the Vermont State Police, had been cross-examined to the same effect. This and other instances in the record demonstrate that the thrust of the petitioner's inquiry was fully answered. The jury was adequately informed of the fact that Mrs. Badore had been in state custody prior to the trial. The petitioner asserts that *Alford v. United States*, 282 U.S. 687, 51 S.Ct. 218, 75 L.Ed. 624 (1931) is directly in point. In a federal prosecution for using the mails to defraud, a principal government witness and former employee of the accused, was asked at the start of cross-examination—"Where do you live, Mr. Bradley?" On the prosecution's objection that the question was immaterial and not proper cross-examination, the answer was excluded. The defendant sought to establish that the witness was in the custody of federal authorities. All further inquiries in this area were foreclosed, including the development that the witness' testimony could be biased because given under promise or expectation of immunity or under possible coercive effect by reason of his detention by federal officers. The opinion of the Court by Justice Stone, in reversing the conviction, without reaching any Sixth Amendment claim, points out—

The trial court cut off *in limine* all inquiry on a subject with respect to which the defense was entitled to a reasonable cross examination. This was an abuse of discretion and prejudicial error.

*Id.* at 694, 51 S.Ct. at 220 (citations omitted).

The context of Berard's trial is differently composed. The record is replete with references on both direct and cross-examination to the witness' custody and interrogation by police officers. Defense counsel was afforded the opportunity to explore this subject matter in depth.

*The Child Custody*

■ The petitioner claims his Sixth Amendment right to confront the witness Badore was violated by the trial court's restriction of his cross-examination concerning Mrs. Badore's fear that the State might deprive her of the custody of her three-month old child. The witness was asked if the petitioner ever suggested to her, in an effort to keep her from saying anything against him, that if she did, the police might do something about her baby. The question was excluded. Subsequently, the witness was allowed to answer a question by defense counsel to the effect that she was very much concerned for the welfare of her child; that in conversations with Berard, and eventually with the police, she had in mind "the scene over her child." The witness was then asked if at some prior time, the witness' mother had made a complaint about her child. On the State's objection, the answer was excluded over the defendant's claim that the witness was afraid she would lose her child—and that this concern was "the potential motive of why this young lady would fabricate the entire story and cooperate with the police and have a better chance of keeping the child." The examiner was permitted to

show that when the witness was taken from her home to the police station, her child was not with her.

The witness was confronted with this aspect of her motivation and it was made abundantly clear to the jury that Mrs. Badore was very much concerned about what might happen to her child. However, there is not the slightest indication in the record that the State of Vermont or any of its agencies threatened the witness with loss of custody. It appears that the only suggestion to this effect originated with the petitioner himself in a question asked by defense counsel within the hearing of the jury. The limitation imposed by the trial court on this phase of the third day of cross-examination is not of constitutional dimension.

*Publication of a Novel*

■ It appears that while Linda Badore was in police custody she prepared a handwritten statement of her version of the crime. Defense counsel had a copy of this account and used the document in cross-examination. In this effort, petitioner's attorney referred to the writing as her "novel." The witness referred to them as statements. On recross-examination the statement, which apparently was a typewritten copy, was exhibited to the witness. She was asked if she ever had any conversations with anybody about the possibility of publishing the writing. The State's Attorney objected that the inquiry was beyond the scope of his redirect examination. The defendant's attorney responded that the question had a bearing on whether the writing was properly characterized as a "statement" or a "novel." The court sustained the objection.

The petitioner in these proceedings attacks the ruling as denying him the opportunity to show her motive in testifying was to profit financially from the petitioner's conviction. This claim was not advanced at the trial and, even had it been, there was no impairment of the petitioner's right to cross-examine. The question came at the conclusion of cross-examination that consumed the major portion of three trial days. The theory of the defense that the witness had undertaken to write a novel about this gruesome experience was persistently driven home to the jury. In this context of the record this court is not persuaded that the trial court's exercise of its discretion exceeded federal constitutional standards.

*False Accusations and Reported Fantasies*

■ The petitioner contended at the trial that the witness Badore "fantasized (the) complete story"—which she testified to at the trial. In pursuit of this theory the witness was cross-examined concerning her hospitalization for mental illness.[2]

2. Q On direct examination, you testified that you had been hospitalized at a mental institution on several occasions?
A. Three occasions.
Q And what were thos (sic) three occasions? Where was it?
A. Where was it?
Q Uh huh.
A. Vermont State Hospital in Waterbury.
Q And three separate times at the Vermont State Hospital?
A. Yes.
Q And have you ever been hospitalized in the psychiatric ward at the DeGoesbriand?
A. Yes.
Q So you have been hospitalized four times?
A. Yes.
Q You also testified that you had not had any psychiatric help at all since you last left Waterbury, is that right?
A. I think so.

Q Did you ever see a Dr. Forsberg?
A. Yes.
Q Was that after or before the last time in Waterbury?
A. She was my doctor the last time.
Q And didn't you see her as an outpatient after that, in Montpelier, or saw her as an outpatient in Waterbury?
A. Yes, I think I did.
Q And didn't you in fact make several appointments after that that were broken?
MR. HUDSON: This is beyond the scope of direct examination.
COURT: We're going to allow it.
WITNESS: Yes.
CROSS–EXAMINATION CONTINUES:
Q Now, how old were you when you were first admitted to the DeGoesbriand?
A. I think I was sixteen.
Q Excuse me?
A. I think I was sixteen.

As appears in the margin, the witness was asked if she ever stated to the authorities at the hospital that she had been carried off to Boston by racketeers and gangsters and if she has ever made false accusations against other people of having been involved in criminal activity. Later she was asked if in the course of her medical treatment she had ever related that she had been threatened by pistols and guns or had ever been threatened before by somebody with a gun. Over the State's objection, further inquiry into statements made by the witness in the course of her psychiatric consultation and treatment was precluded.

That the witness had been hospitalized and treated for mental illness and psychiatric problems was repeatedly presented to the jury through extensive inquiry by the defense and the prosecution as well. It appeared that she had been confined at the state hospital at least three times prior to August, 1969, when she was sixteen and was subsequently treated at the psychiatric unit of the Vermont Medical Center. The effort of the petitioner's counsel at the

murder trial to elicit various statements made by the witness while she was undergoing psychotherapy some four years earlier was an area properly within the discretion of the trial judge. The witness' propensity for indulging in fantasy and her underlying mental illnesses were clearly exposed in the more than two hundred and fifty pages of her cross-examination which preceded this particular inquiry. Beyond that, independent evidence was presented through a psychiatrist, called by the defendant, that Mrs. Badore was a good actress and a neurotic, self dramatic person. The error, if any there was, is to be measured in terms of the court's discretion, rather than the fundamental right of confrontation within the precept of *Davis v. Alaska, supra,* 415 U.S. at 319, 94 S.Ct. 1105. *United States v. Finkelstein,* 526 F.2d 517, 529 (2d Cir. 1975).

The theory of the defense that Mrs. Badore's testimony was the product of complete fantasy is entirely belied by the record. Substantially every aspect of the evidence presented by the State through this witness, concerning the details of her

Q And what was the medical cause for you going in there at that time, do you remember?
A. I had run away from home and my mother put me there.
Q Had you ever received any other psychiatric help from any other institution in the State besides those you mentioned?
A. As an outpatient at the DeGoesbriand.
Q And when you were at Woodstock, did you receive any help there?
MR. HUDSON: Objection. Outside the scope of direct examination.
COURT: Yes. Sustain the objection.
CROSS–EXAMINATION CONTINUES:
Q You were hospitalized at Waterbury on three occasions. On the first occasion, what was the reason that you were hospitalized?
A. I was very depressed.
Q Was there a suicide attempt involved?
MR. HUDSON: Objection. Beyond the scope of direct examination.
COURT: We'll let her answer.
WITNESS: No.
CROSS–EXAMINATION CONTINUES:
Q Not that time?
A. No.
Q Have you ever attempted suicide?
A. Yes.
Q How many occasions?

A. Three, I think.
Q Linda, did you ever state to the authorities at the hospital that you had been carried off to Boston by racketeers and gangsters?
MR. HUDSON: Objection.
COURT: Sustained. Excluded.
CROSS–EXAMINATION CONTINUES:
Q Linda, at any time, have you ever made allegations against other people of having been involved in criminal activity?
MR. HUDSON: Objection; completely irrelevant.
COURT: Yes. Sustained; excluded.
Q Have you ever, Linda, ever made false accusations against any person involved—
MR. HUDSON: Objection.
COURT: Same ruling. Sustained.
Q Linda, do you know what your diagnosis was when you were at Waterbury on these different occasions?
MR. HUDSON: Objection. We think irrelevant.
COURT: We'll let her answer yes or no.
WITNESS: I believe it was suicide.
CROSS–EXAMINATION CONTINUES:
Q Did anyone ever tell you have (sic) have a passive aggressive personality?
MR. HUDSON: Objection.
COURT: Sustained; excluded.

accompaniment of Berard, Rebideau and the victim, from the evening of August 12 through August 13, 1972, was corroborated by disinterested and unimpeachable witnesses. The witness Badore's testimony was further confirmed by incriminating physical evidence that was jettisoned along the route of travel directed by the petitioner from Burlington to Royalton and the roundabout return journey following the murder.

*Conclusion*

█ The court's concern is not whether the trial court committed evidentiary error in excluding the particular questions asked of the witness Badore by defense counsel. The ultimate and controlling question is whether the exclusions violated the Confrontation Clause of the Sixth Amendment within the meaning given in *Davis v. Alaska, supra,* 415 U.S. at 315, 94 S.Ct. 1105.

█ The petitioner's right to confront Linda Badore is secured in state as well as federal criminal trials and includes the right of cross-examination. *Id.; Pointer v. Texas,* 380 U.S. 400, 417, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965).

Cross-examination is the principal means by which the believability of a witness and the truth of his testimony are tested. Subject always to the broad discretion of a trial judge to preclude repetitive and unduly harassing interrogation, the cross-examiner is not only permitted to delve into the witness' story to test the witness' perceptions and memory, but the cross-examiner has traditionally been allowed to impeach, i. e., discredit, the witness. One way of discrediting the witness if to introduce evidence of a prior criminal conviction of that witness. By so doing the cross-examiner intends to afford the jury a basis to infer that the witness' character is such that he would be less likely than the average trustworthy citizen to be truthful in his testimony.

*Davis v. Alaska* 415 U.S. at 316, 94 S.Ct. 1105, 1110.

At Berard's trial there apparently was no record of prior convictions on the part of the witness. However, the accused cross-examined the witness to develop the point that she "had driven on another job for Frank (Berard) involving stolen motors and had done" other criminal jobs at his request. Her involvement in the murder was clear and defense counsel inquired exhaustively as to each and every detail of the witness' observation at the murder scene.

The witness' sordid life history was the subject of continuing and repetitive inquiry. It was shown that she was a psychopath who was addicted to alcohol, that she had consumed an excess of drinks on August 12 and that she told the petitioner she was sick on the morning of August 13 because she had "too much to drink the night before." Defense counsel questioned Mrs. Badore extensively concerning the narrative she had written while in police custody, which defense counsel repeatedly referred to as her "novel." In sum, the record effectively demonstrates that defense counsel was unrelenting in delving into the witness' story and testing her perceptions. Every facet of the witness' character, her mental illness and her motivations were covered in one fashion or another. In the course of the extensive cross-examination over the large part of three trial days the trial court was now and then called upon to preclude remote, repetitive and sometimes harassing inquiries. The court's reading of the extensive record fails to indicate that any of the exclusionary rulings directly affected the guilt or innocence of the accused. Rather, they concerned collateral matters that were otherwise developed in Mrs. Badore's testimony or evidence by other witnesses.

█ Whether the petitioner's claims are measured in terms of the Confrontation Clause of the Sixth Amendment or the Due Process Clause of the Fourteenth Amendment protecting fundamental right to a fair trial, the constitutional objectives are essentially the same. The denial of cross-examination or its significant obstruction calls into question the "integrity of the fact-finding process." *Chambers v. Mississippi,* 410

U.S. 284, 295, 93 S.Ct. 1038, 1046, 35 L.Ed.2d 297 (1973); *Berger v. California, supra,* 393 U.S. at 315, 89 S.Ct. 540. But unlike the crucial foreclosure of cross-examination of witnesses who had made prior confessions in that they, rather than the defendants, were the killers as in *Chambers* and in *Welcome v. Vincent,* 549 F.2d 853, pp. 858–859 (2d Cir. 1977), the trial court's restrictive rulings were tangential to the main areas of inquiry that had been explored in depth, with the witness Badore and by questioning of other witnesses. The total cross-examination was entirely adequate to afford the jury a basis to properly appraise the witness' motivation and to evaluate the theory of the defense that her testimony was not worthy of belief. *See United States v. Ong,* 541 F.2d 331, 342 (2d Cir. 1976); *United States v. Campbell,* 426 F.2d 547, 550 (2d Cir. 1970).

The record of the trial tendered by the petitioner fails to establish that there was an unconstitutional limitation imposed on his right to confront and cross-examine the witness Badore. The petitioner's application for a writ of habeas corpus is denied. It is so *ORDERED.*