**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Thomas H. KERR and Darwyn C.
Fuller, Defendants-Appellants.**

No. 84–8790.

United States Court of Appeals,
Eleventh Circuit.

Dec. 19, 1985.

Bobby Lee Cook, James Wyatt, Summerville, Ga., for T. Kerr.

Albert Burkhalter, Rome, Ga., for D. Fuller.

Lark Ingram Tanksley, Asst. U.S. Atty., Atlanta, Ga., for plaintiff-appellee.

Before HILL and FAY, Circuit Judges, and HOFFMAN *, District Judge.

---

* Honorable Walter E. Hoffman, U.S. District Judge for the Eastern District of Virginia, sitting by designation.

HILL, Circuit Judge:

This is an appeal from a prosecution for conspiracy to commit mail fraud and for mail fraud. The government sought to prove at trial that the appellants, Thomas H. Kerr and Darwyn C. Fuller, obtained insurance on the the contents of a pharmacy and an affiliated business selling stereo equipment, intentionally set fire to the premises in which these businesses were housed, and attempted to collect insurance on the business by placing three separate proof of loss statements in the mails. The appellants raise three categories of issues on appeal: (1) whether testimony admitted at trial to prove motive for arson was so prejudicial that it should have been excluded under Rules 403 and 404(b), Federal Rules of Evidence; (2) whether there was insufficient evidence of mail fraud and conspiracy to commit mail fraud; and (3) whether the trial court erred in refusing an evidentiary hearing on the appellants' motion for a new trial grounded on an alleged misrepresentation by one of the jurors at voir dire.

## FACTS

Appellant Kerr is a registered pharmacist in Georgia. In 1977 Kerr purchased the ongoing pharmaceutical business of Landers Pharmacy in Rome, Georgia.[1] In 1981 Kerr rented space in a building adjoining the pharmacy and began operating a business selling stereo equipment, the Stereo Den. Shortly thereafter, Kerr entered into partnership with Darwyn Fuller. Under the terms of the agreement, Fuller was to manage the Stereo Den in return for a percentage of the profits of that business.

In 1977 Kerr purchased a $200,000 insurance policy from the Hartford Insurance Company. The policy covered the contents of the pharmacy from loss due to fire or burglary, and contained professional liability coverage as well. The payees on the loss portion of the policy were Bud Lan-

ders, the former owner of Landers Pharmacy, and the Allied Capital Corporation, a creditor of Landers Pharmacy. Also in 1977, Bud Landers purchased a $125,000 insurance policy from Hartford that covered the building in which the pharmacy was located.

Landers Pharmacy was burglarized on February 2, 1981, October 14, 1981, and November 28, 1981. After the third burglary, Hartford canceled Kerr's $200,000 policy. Cancellation occurred in December, 1981. Kerr thereafter obtained a separate $125,000 insurance policy from Hartford that covered Landers Pharmacy in the event of fire loss and also contained professional liability coverage. The partnership of Kerr and Fuller obtained a $100,000 insurance policy from the Waco Insurance Company that covered the Stereo Den from fire loss.

Testimony at trial established that on January 19, 1982 Kerr and Fuller closed the Landers Pharmacy and the Stereo Den at its usual closing time of approximately 7:00 p.m. Melonie Jackson, a cashier, and William Fricks, an assistant pharmacist, left the building with Kerr at approximately 7:00 p.m. Fuller, explaining that he thought he saw a light left on in the Stereo Den, remained in the building. At approximately 7:10 p.m. Billy Rampley, walked outside his home which was situated near Landers Pharmacy and heard a burglar alarm sounding from the pharmacy premises. Smelling smoke, he discovered that the pharmacy was on fire. After directing his wife to call the fire department, Mr. Rampley went back to the pharmacy and waited outside for the fire department.

At approximately 7:10 p.m. David Cargle was driving past the Landers Pharmacy. He heard the burglar alarm go off, drove on about a quarter of a mile, smelled smoke and turned back. Returning to the pharmacy, Mr. Cargle saw smoke and flames coming out of the Stereo Den window. Mr. Cargle, too, called the fire de-

---

1. Kerr merely purchased the business interest; he did not purchase the building in which the pharmacy was located.

partment from a mobile phone in his pickup truck. Thereafter, he drove around to the front of the building, got out of the truck and kicked down the door to the Stereo Den in an attempt to salvage some of the merchandise. Smoke billowed out of the door and he closed it quickly.

It was at this time the fire department arrived. Mr. Carl Green, Deputy Chief, Rome fire department, received a call that the Landers Pharmacy was on fire at approximately 7:13 p.m., January 19, 1982. Mr. Green arrived at the scene of the fire at 7:19 p.m., entered the building at the northern end of the Stereo Den where it joined Landers Pharmacy, and observed severe burning in the Stereo Den and in the pharmacy. Fire was moving from the Stereo Den into the pharmacy by force through adjoining doors between the two businesses. Mr. Green remained at the pharmacy most of the ensuing night directly firefighting teams. During the course of this activity he observed two low burns within the building. One low burn was at the Stereo Den side of the doorway adjoining the pharmacy. The second low burn was in the back of the Stereo Den. Mr. Green pointed these burning patterns out to George Lanier, the fire marshal of the Rome fire department.

It was Mr. Lanier's duty to determine the cause of the fire. After observing the course of the fire and, later, investigating the scene, Mr. Lanier determined that the fire was not accidental. Burning patterns in the rooms, including charring under applicances in the Stereo Den indicating the presence of flammable liquids seeping over the floor, led Mr. Lanier to suspect arson.

He also examined other possible causes for the fire including heaters, electrical wiring in the walls, and a possible short circuit from the fuse box on the premises. There was no indication of a malfunction in any of these units. Additionally, there was no evidence of forced entry into the pharmacy. In fact, the back door to the pharmacy was secured from within. There was no fire in the basement and no forced entry into the basement. Finally, it was significant that

the fire was discovered not more than eleven minutes after the vacation of the premises by Kerr and, later, Fuller. Considering the advanced burning that was present when the firefighters arrived on the scene approximately ten minutes after the fire was discovered, and that this development had occurred over a course of approximately fifteen minutes from the time Kerr and Fuller left, it was Mr. Lanier's opinion that the fire had been intentionally set.

Evidence was also had from a Mr. Malcom Martin, an electrical engineer. Mr. Martin testified that he had examined the electrical systems within the buildings and conclusively ruled out electrical short circuiting as a cause of the fire.

Finally, testimony was taken from Mr. Lloyd Erwin, a forensic chemist with the Bureau of Alcohol, Tobacco and Firearms. Mr. Erwin examined samples of debris taken from locations where there were low burn patterns in the buildings. His examination revealed the presence in those samples of flammable liquids, medium range distillants including paint thinners.

Following the fire, Kerr and Fuller attempted to collect on two insurance policies held on their businesses. Both Kerr and Fuller submitted through the United States mails three sworn notarized statements in proof of loss arising from the fire.

The defendants were named in an eight count indictment charging them with violations of 18 U.S.C. §§ 371, 1341, and 1342. The defendants were arraigned on July 16, 1984 and entered pleas of not guilty to all charges. The case was tried in August, 1984. At the conclusion of the trial the jury returned verdicts of guilty as to all counts. Defendant Kerr was sentenced to three years on counts I, II, III, IV, V, VI, VII, and VIII with the sentence imposed as to each count to run concurrently. Defendant Fuller was sentenced to eighteen months on counts I, and II, the sentences to run concurrently. On count III, IV, V, VI, VII and VIII, the defendant was sentenced to two years concurrent, that sentence to run consecutively with the sentence imposed on counts I and II. The

sentence on counts III, IV, V, VI, VII, and VIII was suspended with the defendant being placed on probation for a period of three years, the same to commence on his release from the sentence served on counts I and II.

Prior to sentencing, the appellants moved for a new trial or an evidentiary hearing, or, alternatively, for judgment of acquittal notwithstanding the verdicts. The trial judge denied these motions. On October 1, 1984, the defendants filed a motion for reconsideration and this motion, too, was denied. A notice of appeal was filed from the judgment of the district court.

## ISSUES ON APPEAL

The appellants raise three claims on appeal: (1) that the trial court erroneously allowed testimony going to the motive and the intent of the defendants, the probative value of which was outweighed by its prejudicial effect; (2) that there was insufficient evidence to support the convictions; and (3) that the trial court erred in refusing an evidentiary hearing on defendants' motion for a new trial made on the basis of an alleged misrepresentation by one of the jurors on voir dire.

In our view, the evidence is clearly sufficient to support the jury's verdict on the issues of mail fraud and conspiracy to commit mail fraud. Likewise, we do not find error in the district court's refusal to grant an evidentiary hearing on the basis of an alleged juror misrepresentation during voir dire.

The circumstances of the alleged misrepresentation are these. On voir dire, the venire was asked the following questions:

Do any of you now or have you in the past ever been employed by any agency of the federal government, including your immediate family?

. . . .

Do any of you have any members of your immediate family who are law enforcement officers who work in any capacity with the federal government, with the Alcohol Tobacco and Firearms Department, which is the agency that's handling this case, or the F.B.I., the Georgia Bureau of Investigation, or any law enforcement agencies to where you or your children or any members of your immediate family are affiliated with any law enforcement agency?

Do any of you know personally or socially or in any capacity any person who works for the Alcohol Tobacco and Firearms Department, which is an agency of the federal government that's assisting in the prosecution of this case?

. . . .

... Do any members of the jury or any members of their immediate family work for a fire department?

Trial transcript at 27–28. One juror, Mrs. Shelby Ray, did not respond to these questions. After the jury rendered the verdict in this case it was discovered that Mrs. Ray is married to a former law enforcement officer of Bartow County, Georgia. Having discovered this information, the appellants moved for an evidentiary hearing to determine whether Mrs. Rays' affiliation with law enforcement entitled them to a new trial under *McDonough Power Equipment, Inc. v. Greenwood*, 464 U.S. 548, 104 S.Ct. 845, 78 L.Ed.2d 663 (1984).[2] The dis-

---

**2.** *McDonough* was a suit for damages sustained by a user of a power mower. During voir dire the prospective jurors were asked whether any of them or any members of their family had ever sustained severe injury. A juror not responding to this question was subsequently found to have had a son injured by an apparently defective product, a tire which exploded. In evaluating the effect of this nonresponse to the trial proceeding the court stated:

We hold that to obtain a new trial in such a situation, a party must first demonstrate that

a juror failed to answer honestly a material question on *voir dire*, and then further show that a correct response would have provided a valid basis for a challenge for cause. The motives for concealing information may vary, but only those reasons that affect a juror's impartiality can truly be said to affect the fairness of the trial. *McDonough*, 464 U.S. at 556, 104 S.Ct. at 850.

Finding the lack of response did not affect impartiality, the Court held no unfairness was demonstrated and denied a new trial.

trict court denied this motion. *United States v. Kerr,* No. 84–16R (N.D.Ga. Sept. 26, 1984). We believe that denial was correct.

*McDonough* involved an absence of response to a question clearly and directly posed. We have a different case here. The lawyers in this case did not ask a question about the jury venire's relation to former law enforcement officers. While the parties in this or any other case are of course entitled to an impartial jury and to an honest and straightforward response from potential jurors on voir dire in order to obtain such a jury, we cannot put upon the jury the duty to respond to questions not posed. Had the lawyers wished to know about relations to former law enforcement officers they should have asked. They did not. We affirm the district court's denial of an evidentiary hearing on this issue.

This leaves for our review merely the question of abuse of discretion by the district court in admitting motive and intent testimony alleged to be unduly prejudicial under Rule 403 and Rule 404(b), Federal Rules of Evidence.

## THE DISTRICT COURT'S EXERCISE OF DISCRETION IN THE ADMISSION OF CHALLENGED TESTIMONY

The appellants contend that the trial court abused its discretion in the admission of documentary and testimonial evidence proposed by the government to show motive and intent for arson. The basis for this claim is the prejudicial effect of the challenged evidence. The appellants argue that this prejudicial effect substantially outweighed any probative value contained in the evidence itself.

The specific evidence challenged includes the individual tax returns of Kerr for the years 1980 and 1981, and the Stereo Den's partnership tax returns for those same years. Under the standards set out in subsequent discussion of other testimony in this case, we find the admission of this evidence unobjectional. Certainly the government was entitled to prove that a motive to commit arson arose from losses sustained in the operation of the appellants' businesses. The tax returns were lawfully obtained. They were competent evidence of these losses. Clearly the district court did not abuse discretion in allowing them into evidence.

The gravamen of the appellants' claims, however, concerns admitted evidence about Kerr's practices as a pharmacist. The testimony at issue came from two sources, Dr. Gary Kaufmann, a neurosurgeon, and Mr. Walter Matthews, an attorney affiliated with an insurer of a customer of Kerr, Mr. Donald Byerly.

Dr. Kaufmann testified that in October, 1980 he prescribed drugs for his patient Byerly, and that these prescriptions were filled by Kerr at Landers Pharmacy. The prescribed drugs included several Schedule II narcotics. Byerly was going to Florida for the winter so Dr. Kaufmann wrote prescriptions with three refills, an amount of drugs sufficient to provide for Byerly's needs while out of the state. These prescriptions were filled at Landers Pharmacy. All prescriptions and their refills were provided at one time. Later, unknown to Kaufmann, Byerly called Kerr and informed him that he would be in Florida longer than anticipated. Byerly then asked Kerr to "get an o.k. from Dr. Kaufmann and send [me] another three months supply of medication." Kerr called Kaufmann's office and talked to Doris Franco, Kaufmann's office manager, who orally approved the dispensing of an additional three months' supply of medication for Byerly. Kaufmann was not contacted and did not authorize this prescription. Kerr sent the medicine to Byerly.

In February of 1981, the Pennsylvania National Insurance Company, Byerly's Workmen's Compensation carrier, contacted Kaufmann and asked him whether he had prescribed the medicine given to Byerly in January 1981 and whether the charges for these medications were "abnormally high." At the trial of this case, the district court had instructed Kaufmann to make no reference to the amount charged

for the drugs. Kaufmann nevertheless stated that it was his opinion the charges were indeed abnormally high, that the dispensing of the drugs in January, 1981 was not authorized by Kaufmann, and that this conduct appeared to be highly irregular and unethical. Finally, Kaufmann testified that the only other time he had seen this type of dispensing of drugs was when a drug-abusing individual and a pharmacist colluded in the illegal dispensation of narcotics.

After Kaufmann's testimony, the district court issued a limiting instruction stating to the jury that Kaufmann's testimony was admissible only for the purpose of showing the motive of Kerr in this case.

Additionally, the government introduced testimony of Mr. Walter Matthews, an attorney for the Pennsylvania National Insurance Company, and testimony of James Cope, an Agent of the Georgia Drug and Narcotics Agency. Mr. Matthews wrote Kerr in December of 1981 in connection with Byerly's Workmen's Compensation claim. Matthews asked Kerr in this letter to "clarify some drug bills" that had been submitted as a part of Byerly's Workmen's Compensation claim. On January 18, 1982, the day before the fire, Kerr called Matthews and informed him that he did not have, or that he could not find, copies of the prescriptions because the prescriptions had been filled 12 to 15 months earlier.

Agent Cope audited Landers Pharmacy on October 7, 1981, comparing invoices of drugs purchased with records of drugs dispensed through prescriptions. The audit revealed shortages and overages in fifteen Schedule II drugs. On November 10, 1981, Agent Cope advised Kerr that Kerr would be scheduled for a hearing before the State Pharmacy Board and that, if Kerr would agree to turn in this license for six months, the Board would probably dispose of his case. Kerr stated he could not bear the financial burden of hiring another pharmacist, a necessity if the business were to continue in operation without Kerr's license.

The substance of Kaufmann's testimony, taken together with the testimony of Matthews and Cope, was thus that there were irregularities in Kerr's practices as a pharmacist and that these irregularities were about to seriously affect Kerr's ability to continue in business. The imminent collapse of the business, the government argues, was proper proof of motive to commit arson. The appellants urge that this evidence raised the implication of narcotics trafficking. They claim this implication was so prejudicial that it outweighed the probative value of the evidence giving rise to it, making that evidence inadmissible.

In *United States v. Beechum*, 582 F.2d 898 (5th Cir.1978) (en banc), *cert. denied*, 440 U.S. 920, 99 S.Ct. 1244, 59 L.Ed.2d 472 (1979), our predecessor court articulated the standard to be used in determining the admissibility of evidence of acts extrinsic to the indictment under Federal Rules of Evidence 403 and 404(b). Under the *Beechum* standard, a two-pronged test for admissibility is used. The court must first determine whether the proffered testimony is relevant to an issue other than the defendant's character. If such relevancy is established, it must then determine whether the probative value of the evidence is substantially outweighed by prejudice arising from it, and whether the proffered evidence is otherwise admissible under Rule 403. *Beechum*, 582 F.2d at 911. *See also United States v. Pepe*, 747 F.2d 632, 670 (11th Cir.1984).

This case was a prosecution for mail fraud and conspiracy to commit mail fraud; the predicate crime was arson. In offering Dr. Kaufmann's testimony, the government attempted to show that, some fifteen months prior to the counts giving rise to this case, Kerr engaged in irregular practices in the dispensing of drugs. Thus, the evidence offered was clearly of acts extrinsic to the indictment. Additionally, the government offered Walter Matthews' testimony, which was generally to the effect that inquiries about the earlier dispensing irregularities were being made, to show that the irregularities in drug dispensing

were about to be discovered. Thus, this evidence, too, was of circumstances extrinsic to the indictment. It is nevertheless our view that, taken together, these lines of testimony were relevant to the issue of motive and intent to burn the business because, under Rule 401, the testimony tended to show a reason to destroy the records of the pharmacy. Finally, Agent Cope's testimony, while clearly of acts extrinsic to those charged, was certainly relevant to the likelihood of the collapse of the business. Collapse of the business was motive for arson. This testimony, too, was relevant.

The more difficult question is whether this evidence gave rise to prejudice substantially outweighing its probative value on the issue of intent and motive. We recognize that testimony concerning irregularity in the dispensing of Schedule II narcotic drugs may be inflammatory. Similarly, we note that at least part of this evidence concerned acts remote in time to the incidents in question in this case. However, as is often true with evidence tending to show motive and intent, prejudice arises for the same reason as probativeness. The graver the consequences of an act, hence the greater the prejudice coming from its revelation, the more likely it would be that

a defendant would wish to conceal that act by, for example, destroying the evidence in a fire. Additionally, while it is true that the events testified to by Dr. Kaufmann were remote in time from the events at issue in this case, other testimony established the immediacy of those events by showing an imminent likelihood of discovery through the incidental means of a workmen's compensation insurer's routine inquiry, or a hearing before the Georgia Pharmacy Board. Viewing these strains of evidence together, we see the government attempting to show that Kerr had engaged in acts which a person in his position would wish to conceal and that this concealment, heretofore successful, came into peril at a time immediately preceeding the fire. Probativeness and prejudice were closely intertwined.

In weighing probativeness and prejudice we approach the issue with deference to the sound discretion of the trial judge. *See United States v. McMahon*, 592 F.2d 871, 873 (5th Cir.), *cert. denied*, 442 U.S. 921, 99 S.Ct. 2847, 61 L.Ed.2d 289 (1979). We note that the district court instructed the jury at length that the testimony of Dr. Kaufmann was to be considered only on the issue of motive.[3] As thus limited, we do not find

---

3. The court's instruction was as follows:

Now, ladies and gentlemen of the jury, in the testimony just given by Dr. Kaufmann, he commented about a matter of ethics. I instruct you that ethics is not in issue in this case. The court overruled an objection to the doctor's opinion about ethics. I overrule that objection because I admitted the testimony of the doctor with reference to what he said about ethics for the purpose of your understanding the doctor's testimony and the position of that witness in this case.

However, I instruct you that you are not concerned with any any ethics in connection with any defendant in this case. Also, let me caution you explicitly again that this is not a case in which any defendant is charged with any drug violation and you are not in any way concerned with any issue in this case as to drugs, except as it may relate to motive, if it does, with reference to the charges that are made in the indictment in this case.

No defendant in this case is charged with a drug violation and you may not consider any evidence as charging a drug violation. Any evidence admitted as from this physician and

any other witness with reference to any testimony concerning drugs is admissible only for the purpose of going to motive with reference to the matters charged in the indictment, if it does show any motive or attempt to show any motive in connection with the charges made in this case.

Also, the court sustained an objection to the physician testifying as to the amount of any bill. He testified or started to testify with reference to his concern about bills. You're not in any way concerned and it is irrelevant and immaterial to the issues in this case as to any concern he might have had with reference to any bills that he may have seen or alluded to with reference to charges made for any medications. That is entirely irrelevant and immaterial to the issues in this case. The court rules that it confuses the issues and is immaterial to the true issues in the case to in any way be concerned with the testimony having to do with bills.

So the court cautions you as to those particular matters: ethics, bills, drugs. Any testimony as to bills is completely inadmissible and is excluded; any testimony as to this

that the prejudicial effect of this testimony substantially outweighed its probative value so as to make its admission an abuse of discretion. Likewise, we uphold the district court's judgment that the testimony of Matthews and Cope was more probative than prejudicial. We therefore affirm the decision of the district court on this point.

## SUMMARY

For the reasons foregoing, the judgment of the district court is AFFIRMED.

HOFFMAN, District Judge, dissenting:

I agree with the majority that the trial court properly denied a post-trial evidentiary hearing based upon an alleged misrepresentation by one of the jurors in responding to certain *voir dire* questions. The questions propounded clearly did not call for a response by the juror as to whether she was related by blood or marriage to a *former* law enforcement officer.

I also agree that, aside from the extrinsic evidence hereinafter discussed, the government had a clear right to show a motive to commit arson (the predicate crime), which motive arose from losses sustained in the operation of the businesses conducted by Kerr and Fuller, and to this end the introduction of Kerr's tax returns for 1980 and 1981, the Stereo Den's partnership tax re-

turns for the same years,[4] and the three proofs of loss submitted to the insurance companies, constituted proper evidence to establish that losses had been sustained and discrepancies existed. While the majority opinion does not mention the lucrative Polk County Nursing Home phase of operation by Kerr, it is nevertheless true that the figures for Landers Pharmacy, Polk County Nursing Home pharmacy, and the Stereo Den partnership, reflected an operating loss and a substantial indebtedness.[5]

Coupled with the fact that Kerr and Fuller were the last ones to leave Landers Pharmacy and the Stereo Den at approximately 7:00 p.m. on January 19, 1982, with the fire being noticed by others within eight to eleven minutes thereafter, there was ample evidence to go to the jury to decide whether Kerr or Fuller, or both, started the fire.

My agreement with the majority ends at this point. Even though the defendants may have been guilty, they are still entitled to a fair trial. The use of extrinsic evidence under the guise of showing motives was devastating and, in essence, was a character assassination against Kerr, which resulted in Fuller sharing the ultimate responsibility.

witness's opinion as to ethics is admitted only for the purpose of explaining his conduct, the witness's conduct, if it does, and as it may impact upon his testimony; and any evidence having to do with drugs is admissible only for the very limited purpose of going to motive, if it does.
Trial transcript at 621–23.

4. The Stereo Den partnership consisted of Kerr and Fuller, under an arrangement for the division of profits between them.

5. According to the government auditor, a certified public accountant, the 1980 and 1981 operations revealed the following:

|  | Landers Pharmacy | P.C.N. Pharmacy | Stereo Den* |
|---|---|---|---|
| 1980 | Loss – $163,000 | Profit – $144,000 | Profit – $3,600 |
| 1981 | Loss – $181,000 | Profit – $176,000 | Profit – $1,000 |

* Fuller did not draw a salary from Stereo Den. His arrangement was that he was to receive 40% of the profits. Obviously, the Stereo Den operated at a loss if a reasonable salary had been attributed to Fuller for his full-time services.

As of the date of the fire on January 19, 1982, Landers Pharmacy, owned and operated by Kerr, owed at least $185,000, and the partnership known as Stereo Den owed $46,000. Additionally, within a short period prior to the fire, checks were issued with insufficient funds in bank. The profitable venture, Polk County Nursing Home pharmacy, was operated out of the Landers Pharmacy premises and was owned by Kerr; the bookkeeping was separated merely for the convenience of Kerr.

Prior to the commencement of the trial, Kerr filed a motion *in limine* [6] to exclude various types of evidence including, but not limited to, an audit by James Cope, an agent of the Georgia Drug and Narcotics Agency, who had conducted the audit of October 7, 1981—about three and one-half months prior to the fire. The audit covered the period from April 30, 1981 to October 7, 1981, and Cope had copied and retained all of Kerr's records with respect to the Schedule II drugs which were short or over. Either shortages or overages were found in fifteen Schedule II drugs, [7] and Cope testified that the presence of overages indicated improper record keeping.

Following the audit by Cope, Kerr was again visited by Cope on November 10, 1981, at which time Kerr was advised that he would be scheduled for a hearing before the State Pharmacy Board, and Cope suggested that if Kerr would agree to surrender his license for a period of six months, the Board would then dispose of the case.

The defendant objected to this evidence, [8] but Cope was permitted to continue by stating that Kerr indicated that he could not surrender his license as he could not financially stand to lose his license for six months. [9] Nothing further was heard from Cope or the State Pharmacy Board until after the fire.

Allied with the foregoing evidence is the testimony of Dr. George Kaufmann, a neurosurgeon, and Walter Matthews, an attorney affiliated with an insurer of Kerr's customer, Donald Byerly. This goes back to prescriptions issued in October, 1980—fifteen months before the fire. Because Byerly was going to Florida, Dr. Kaufmann wrote prescriptions covering three refills. The testimony on this issue is correctly summarized by the majority opinion, and Kerr had thereafter refilled the prescriptions in January, 1981, at Byerly's request, when Byerly telephoned Kerr and advised that he was going to extend his stay in Florida, and with the approval of

6. The Court partially granted the motion *in limine* in that it excluded the action of the State Board of Pharmacy taken after the fire. However, the Court denied the motion with reference to any shortages shown by Cope's audit in October, 1981. Then the Court stated:

And, of course, if the case then gets so involved with drugs that it becomes prejudicial to the defendant—or the defendants to the extent that I can't cure it, I'll handle it with a mistrial, with a motion for mistrial. But I will give the government the chance to put up their case except for the things that I'm granting thus far to protect the defendants in the record.

The Court deferred action on the request to suppress the use of the tax returns, but later ruled same admissible. The Court denied the motion to exclude the evidence as to the drugs supplied by Kerr to Byerly, and the testimony of Dr. Kaufmann and Walter Matthews (Vol. I, pp. 49–52).

7. A Schedule II drug is the strongest narcotic drug that can be dispensed by a pharmacy. Schedule I drugs, such as heroin or LSD, cannot be sold in a pharmacy. Thus, Schedule II drugs, while having an acceptable medical use, have the highest potential for abuse in a pharmacy and all prescriptions for Schedule II drugs are kept separate. Schedule III, IV and V drugs, each having an acceptable medical use, have correspondingly less potential for abuse.

8. Even if the defendant had not objected, the matter was raised on the motion *in limine*. As a

general rule, an objection to the admission of evidence made through a motion *in limine* is preserved on appeal despite any failure to object to the evidence at trial, assuming that the trial court treated the motion in detail. *American Home Assur. Co. v. Sunshine Supermarket, Inc.,* 753 F.2d 321 (3d Cir.1985). *Contra: Rojas v. Richardson,* 713 F.2d 116 (5th Cir.1983). *See also,* in accord with the Third Circuit, *Sheehy v. Southern Pac. Transp. Co.,* 631 F.2d 649 (9th Cir.1980).

9. The majority inadvertently refers to a statement attributed to Kerr in his conversation with Agent Cope where it is stated "he [Kerr] could not bear the financial burden of hiring another pharmacist, a necessity if the business were to continue in operation without Kerr's license." Agent Cope did not so testify and Kerr was not questioned on this point. In all probability the majority's reference to this testimony came from the prosecutor's argument to the jury (Vol. V, p. 814), or from the several references by the prosecutor to the necessity of hiring another pharmacist if Kerr's license was surrendered, made in bench conferences. The testimony of Cope is correctly stated in the body of this dissent. However, as Kerr was concededly in adverse financial straits, it is not important, except to note that Fricks, a licensed pharmacist, was still available as a Landers Pharmacy employee.

Dr. Kaufmann's office manager, Doris Franco. Despite efforts to keep the witness Kaufmann under control, he persisted in his efforts to refer to excessive charges for the drugs, and finally (Vol. IV, p. 605), Kaufmann was asked by the prosecutor:

Q. During your years of practice, have you ever seen drugs dispensed in such a manner?

A. Only once in my life, and that was a severe case of drug abuse that was— the patient was participating with the pharmacist in dispensing—"
(objection overruled)

\* \* \* \* \* \*

A. I would have to say that this was most unusual."

Matthews represented the Pennsylvania National Insurance Company, the carrier of a workmen's compensation claim for Donald Byerly. By letter dated January 11, 1982, apparently received by Kerr a few days thereafter, Matthews wrote to Landers Pharmacy in an effort to obtain copies of prescriptions issued by Dr. Kaufmann for the purpose of determining whether the costs of the drugs were payable in the compensation proceeding. On January 18, 1982—seven days after the date of Matthews' letter and one day prior to the fire— Kerr telephoned Matthews and advised that he either did not have, or could not find, the prescriptions in question.

The government argues, and the district court agreed, that the evidence pertaining to Byerly, Dr. Kaufmann, and Matthews, supplied Kerr with a motive to set fire to the pharmacy by destroying his records.

Finally, we turn to the three burglaries involving Landers Pharmacy during the year 1981. These occurred on February 2, 1981, October 14, 1981, and November 28, 1981. They were investigated by the Police Department and reported to the insurance company, with the insurer later cancelling the policy after the third burglary. The burglaries of October 14, 1981 and November 28, 1981, pertained to the theft of narcotic drugs, all of the Schedule III or IV category. No Schedule II drugs were reported missing.

While the government argues that evidence of the three 1981 burglaries of Landers Pharmacy furnished a motive for Kerr to set fire to the premises, probably the real motive for this evidence is revealed by the prosecutor's final argument to the jury where she said (Vol. V, p. 843):

Government contends that the reason the burglaries occurred is because they had just audited the two, the Class Two drugs and he was—he beat them to it. He was ready to—for the audit of the Threes and Fours but he was going [to] beat them to that audit business; it [is] going to be missing when he got there. (Objection on ground that there was no evidence of a contemplated subsequent audit. Overruled.)
[Prosecutor continuing] You know what's interesting? After the theft insurance was cancelled there were no burglaries. You have theft insurance, you have burglaries; and you get fire insurance and you have a fire.

Against this background the trial court admitted for the purpose of showing "motive," the foregoing facts.[10]

## DISCUSSION

In *United States v. Beechum*, 582 F.2d 898, 912 n. 15 (5th Cir.1978—*en banc*), *cert. denied*, 440 U.S. 920, 99 S.Ct. 1244, 59 L.Ed.2d 472 (1979), our predecessor circuit

---

**10.** In a prosecution for burning to defraud an insurer, it must be shown that the motive of the burning was to defraud the insurer. However, motive is not an essential element of the crime of arson, either at common law or under a statute. This does not mean that evidence with respect to a motive may not be received in an appropriate case. 5 Am.Jur., *Arson and Related Offenses*, § 12, p. 809, §§ 53, 54, pp. 843, 844; 6A CJS, *Arson*, § 9, p. 225, § 51, p. 280. "In a

prosecution for arson, evidence of incriminating circumstances tending to show accused's intent, malice or motive is admissible, if that which is attempted to be shown has some legal and logical relation to the criminal act charged ... Evidence tending to show intent or motive may not be admitted when it is irrelevant, incompetent, or immaterial." 6A CJS, *Arson*, § 41, p. 263.

defined "motive" as "the reason that nudges the will and prods the mind to indulge the criminal intent," citing Slough & Knightly, *Other Vices, Other Crimes*, 41 Iowa L.Rev. 325, 328 (1956). Because the time factor is directly involved in determining "motive," it is important to consider the lapse of time between the extrinsic acts in this case and the actual commission of the crime.

The majority does not refer to the evidence with respect to the three 1981 burglaries of Landers Pharmacy. Over objection, the government established the mode of entry for the last two burglaries, as well as what was taken. It was shown that Schedule III and IV drugs had been stolen and the prosecutor, through some theory of her own, devised the argument that these last two burglaries were to constitute a defense for Kerr when his Schedule III and IV drugs were audited and, therefore, this was a motive for causing the incendiary fire on January 19, 1982. If there had been a shred of evidence from anyone that a future audit of Kerr's Schedule III and IV drugs was to be expected or contemplated, this would have lent a minimal motive for destroying the records. However, the drug losses from the last two 1981 fires were reported to the police and the insurance company, and the motive theory is so unreasonable and unrealistic that the conclusion is inescapable that the prosecutor was merely attempting to show that Kerr arranged for his own burglaries when he had theft insurance, and for his own fire when he had fire insurance. As noted above, this is exactly what the prosecutor argued in her final jury summation. The ruling of the trial court in admitting this extrinsic evidence was so patently erroneous that the majority opinion avoids any reference to same.

All of the evidence pertaining to the extrinsic evidence was developed by the prosecution in its case-in-chief—a situation quite different from that presented in *Beec-*

*hum, supra.* I do not suggest that extrinsic evidence cannot be shown by the case-in-chief,[11] but the quality of proof is certainly more demanding than when it is forthcoming on cross-examination.

As stated by the majority, *Beechum* established a two-step test. First, it must be determined that the extrinsic offense evidence is relevant to an issue other than the defendant's character. Second, the evidence must possess probative value that is not substantially outweighed by its undue prejudice and must meet the other requirements of Rule 403, Federal Rules of Evidence. *Beechum* at p. 911. The majority expresses the view that the trial court applied this test correctly as to all items of extrinsic evidence, although it has been noted that the majority makes no reference to the three 1981 burglaries except to say that this was the reason for the cancellation of Kerr's insurance policy in December, 1981. I respectfully disagree and pause to review the manner in which the trial court considered the Rule 404(b) extrinsic evidence, and then presumably applied Rule 403 in its balancing test.

The record reveals that in the consideration of the motion *in limine*, and thereafter in handling the specific objections to the admissibility of these items of extrinsic evidence, the trial court, except in two instances, avoided any finding that the probative value of the evidence outweighed the danger of undue prejudice. The two instances were (1) the introduction of Agent Cope's report to the State Board of Pharmacy filed three days after the report, together with Kerr's subsequent suspension by the State Board of Pharmacy, and (2) the introduction of the letter from Matthews to Landers Pharmacy, dated January 11, 1982. In each of these instances the trial court ruled that the introduction of these documents would be unduly prejudicial. With reference to the other items of extrinsic evidence, presumably the trial court considered the two-step test in *Beec-*

---

**11.** Left unanswered by the majority in *Beechum* was the question as to whether a mere plea of not guilty justifies the government in introduc-

ing extrinsic offense evidence in its case-in-chief. *Beechum* at p. 915.

*hum* as he admitted the evidence, but there is nothing in the record indicating that the extrinsic evidence was, or was not, relevant to an issue of Kerr's character; nor is there any finding that the extrinsic evidence possessed probative value that is not outweighed by any undue prejudice.

Contrary to the rulings in a majority of circuits, the Eleventh Circuit does not require proof of extrinsic acts by "clear and convincing" evidence. Under Rule 404(b), such evidence is admissible if a jury "could reasonably find" that the defendant committed the extrinsic offenses. *United States v. Pepe*, 747 F.2d 632 (11th Cir. 1984). Consider then, whether a jury "could reasonably find" that Kerr committed the following acts or offenses: (1) Did Kerr arrange for the burglaries committed in 1981 and, if so, was it connected with the loss of narcotic drugs for an illegal purpose; (2) When the Byerly refills were supplied by Kerr in January, 1981, with Kerr billing Byerly for same, by what stretch of imagination can it be concluded that Kerr was desirous of destroying his records, even though attorney Matthews was attempting to secure copies of the prescriptions which, by sheer coincidence, took place just prior to the fire, and (3) With Cope in possession of the records reflecting shortages and overages of the Schedule II drugs, taken from the audit of October 7, 1981, under what theory could Kerr be prompted to destroy his records showing these shortages and overages?

We do not know the effect of the extrinsic evidence upon the jury. It may well be that the jury concluded that the guilt of the defendants was based solely upon the fact that Kerr and Fuller were the last persons to leave the premises; that both Kerr and Fuller were financially strapped with little or no cash flow for continued operation; and the proximity of time between the discovery of the fire and the time that Kerr and Fuller left the premises was so close that the finger of guilt was obvious. While it is true that this was a circumstantial evidence case, that evidence of financial involvement alone, without reference to the extrinsic acts, was powerful and not, as the prosecutor represented by the application of the rule in *United States v. McMahon*, 592 F.2d 871 (5th Cir.), *cert. denied*, 442 U.S. 921, 99 S.Ct. 2847, 61 L.Ed.2d 289 (1979).[12]

Acknowledging that the trial court is vested with broad discretion in determining the admissibility of evidence to the exceptions stated in Rule 404(b), and to the balancing test imposed by Rule 403, I cannot agree that, aside from the financial involvement of both Kerr and Fuller, any "reasonable" motive existed to destroy the records of the pharmacy, especially since these records were already in the hands of other parties who could testify with respect to them. I cannot join my colleagues in giving "the impression that the exception expressed by 404(b) to the ban on character evidence consumes the rule," as stated by P. Rothstein, *Rules of Evidence For the United States Courts and Magistrates*, p. 81 n. 2 (2d ed. 1983), and *S. Saltzburg & K. Redden, Federal Rules of Evidence Manual*, p. 125 (3d ed. 1982) ("Courts have traditionally been very willing to let evidence of other crimes in, even when the prosecution's theory of relevance is quite weak").

As well stated in an article by Weissenberger, *Making Sense of Extrinsic Act Evidence: Federal Rule of Evidence 404(b)*, 70 Iowa L.R. 579 (1985), "rule 404(b) is essentially a sound rule of admissibility if it is judicially applied in a manner con-

---

**12.** In *McMahon*, Judge Hill, the author of the majority opinion in the present case, discusses the "incremental probative value" of the evidence. He lists the factors making up probative value as follows: (1) the availability of other evidence to establish the defendant's unlawful intent; (2) the similarity between the extrinsic and charged offenses; (3) the degree of proximity in time between the extrinsic and charged offenses; and (4) the posture of the case at the time the extrinsic offense evidence is proffered.

While I realize that Rule 404(b) has been the answer to a prosecutor's dream, and while the present case deals solely with "motive," I cannot find myself in agreement with the majority that such type of extrinsic evidence tended to show a reason to destroy the records of the pharmacy.

sistent with its underlying policy of fairness." Stated otherwise, the parties are entitled to a fair trial. Rules 401 (defining "relevant evidence") and 402 (holding that "[e]vidence which is not relevant is not admissible") afford no answer. We must revert to the pre-Rule days as expressed by J. Thayer, *A Preliminary Treatise On Evidence*, 266 (1898), where this noted commentator summarized that, "with the advantage of hindsight, two broad developmental principles underlying evidentiary rules are discernible: (1) logically irrelevant evidence is inadmissible; and (2) logically relevant evidence is admissible, subject to many qualifications and exceptions." Thayer also notes that "Evidentiary exclusionery rules were established to balance the sometimes conflicting goals of truth and fairness by keeping from the jury evidence which would provoke an emotional, rather than rational decision." *Id.* at 266. And Kuhns, *The Propensity To Misunderstand The Character of Specific Acts Evidence*, 66 Iowa L.R. 777 (1981), suggested three factors justifying the exclusion of extrinsic acts: (1) low probative value, (2) distraction, and (3) the prejudicial evocation of punitive instincts in the trier of fact.

Bearing in mind that we operate under an accusatorial system, and not under the inquisitorial system as in ages past, we realize that, as stated in *Brinegar v. United States*, 338 U.S. 160, 173, 69 S.Ct. 1302, 1309, 93 L.Ed. 1879 (1949), "much evidence of real and substantial probative value goes out on consideration irrelevant to its probative weight but relevant to possible misunderstanding or misuse by the jury."

As stated in 1A, J. Wigmore, *Evidence*, § 58.2, at 1216, "extrinsic act evidence creates a risk of improper convictions for a variety of reasons":

The introduction of such evidence is said to create a danger that the jury will punish the defendant for offenses other than those charged, or at least that it will convict when unsure of guilt, because it is convinced that the defendant is a bad man deserving of punishment. In addition, it is argued that the jury might be unable to identify with a defendant of offensive character, and hence tend to disbelieve the evidence in his favor. At the least, it is said that such evidence would be given greater probative value than it deserves, and so lead to convictions on insufficient evidence.

Cases are legion on Rule 404(b). It would be next to impossible to enumerate the many conflicting decisions which have arisen since the 1975 enactment of the Federal Rules of Evidence. It is abundantly clear that the rule of reasonableness is required but, in this circuit, the necessity of "clear and convincing" evidence is not required. I submit that, under the evidence in this case, it is not even "reasonable to infer" that the commission of any one of the extrinsic crimes (or acts) constituted one of the motives for committing the charged crimes.

It is true that, as the majority states, the district court gave limiting instructions to the effect that the evidence of the extrinsic acts should be considered by the jury only to show motive with reference to the matters charged in the indictment. The difficulty is that evidence of extrinsic unrelated acts was admitted to show Kerr's motive. It branded Kerr as a participant in the illegal narcotic trade and, as to the three burglaries, it characterized him as one who prompted an "inside" job in each burglary, i.e., that either Kerr, or someone at his direction, burglarized and stole quantities of drugs from the pharmacy on three occasions during 1981.

Believing as I do that the sole, real and practical purpose of the extrinsic evidence (other than the tax returns, etc.) was relevant only to the issue of Kerr's character, a purpose proscribed by Rule 404(a), I am compelled to conclude that a new trial should have been granted.

## RULE 403

If there is ever a case in which Rule 403 [13] should have been applied, this is that case. This conclusion assumes, of course, that evidence of the extrinsic acts discussed herein constituted relevant evidence.

In *United States v. Ong*, 541 F.2d 331 (2d Cir.1976), Judge Lumbard, in discussing the content of unrelated taped conversations between the defendants, had this to say: "Although ordinarily there are few subjects more potentially inflammatory than narcotics and thus such evidence should usually be excluded in a non-narcotic trial, we believe that in the total circumstances of this case, the trial judge did not abuse his discretion in admitting the challenged conversation." [14] *Ong* stands forcibly against the overkill which took place in the present case. The vigorous prosecutor insisted upon putting in evidence of an extrinsic nature which, in my opinion was irrelevant, but, if incorrect in this conclusion, at best it had a very low probative value. All of this evidence smeared Kerr from the standpoint of character, and painted him as being an illegal dealer in narcotic drugs, as well as one who arranged for his own burglaries.

The majority conceded that the application of Rule 403 gave it great concern. It acknowledged "that testimony concerning irregularity in the dispensing of Schedule II narcotic drugs may be inflammatory." It pointed out that "part of the evidence concerned acts remote in time to the incidents in question in this case." It then based its conclusion on the non-applicability of Rule 403 under the theory that "Kerr had engaged in acts which a person in his position would wish to conceal and that this concealment, heretofore successful, came into peril at a time immediately preceding the fire." Thus, says the majority, "[p]ro-

bativeness and prejudice were closely intertwined." In so holding, the majority was referring to the Byerly/Kaufmann/Matthews phase of the case, and apparently places great reliance upon the coincidence of Matthews' letter of January 11, 1982, and Kerr's telephone call to Matthews the day before the fire. The answer to this argument is that Matthews and Kaufmann had knowledge of the refills prepared by Kerr one year prior thereto, as evidenced by the investigation Matthews was conducting. The bills for drugs sent by Kerr to Byerly were known to Kaufmann and the compensation insurance carrier. Doris Franco, Kaufmann's office manager, had authorized the refills. Kerr had concealed nothing which was not already known by others.

Finally, the majority relies upon the sound discretion of the trial court in considering Rules 404(b) and 403. As heretofore stated, the trial court never discussed or made reference to Rule 403, except in the two instances in which the district court excluded two evidentiary items. Any conclusion that the trial court considered Rule 403 with respect to the three situations of extrinsic evidence now in dispute must be gleaned from the fact that the court admitted the evidence to show Kerr's motive. In a like situation, the Second Circuit held that evidence of the sale of a "sample" of heroin made six hours prior to the offense charged was inadmissible in the absence of any finding with respect to balancing the prejudicial impact of the evidence against its probable cause. *United States v. Levy*, 731 F.2d 997, 1004 (2d Cir.1984).

"Unfair prejudice," within the meaning of Rule 403, "means an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." Note, *Advisory Committee on Rules of Evidence*, Rule 403. Likewise, while as quoted above, the trial court firm-

---

**13.** Rule 403, Fed.R.Evid., provides:

Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by consideration of undue delay, waste of time, or needless presentation of cumulative evidence.

There are no issues of delay, waste of time, or needless presentation of cumulative evidence in this case.

**14.** For a detailed explanation as to the propriety of admitting this damaging testimony, *see United States v. Ong*, 541 F.2d at 340–341. Suffice it to say that the Second Circuit found adequate reasons for not invoking Rule 403.

ly believed that a limiting instruction would be effective. Generally, it is effective, but in this case the totality of the circumstances were such as fall within the prohibitions of Rule 404(a) relating to character evidence.

I cannot believe that the drafters of the Rules of Evidence ever intended that Rule 403 should be disregarded merely because there may be a showing of low probative value under the exceptions to Rule 404(b). If this be the case, Rule 403 should be repealed. Here, because the district court never made any express finding under Rule 403 with respect to the disputed items of extrinsic evidence, I find it difficult to support the majority's conclusion that the district court exercised its sound discretion in handling these matters of evidence.

### DARWYN FULLER

While I would unhesitatingly grant Kerr a new trial, the problem with the defendant Fuller is quite different. Did the spillover effect of this character assassination evidence against Kerr, carry over to Fuller, thus affecting his right to a fair trial? [15]

All of the facts relating to the extrinsic evidence now in dispute refer only to Kerr. Fuller is not mentioned as a direct or indirect participant in any of the extrinsic situations. Except for the fact that Fuller and Kerr were good friends, of long standing, and that they were in partnership together in the operation of the Stereo Den, there is nothing in this record to reflect that Fuller was unduly harmed or that his trial was made unfair because of evidence admitted against Kerr. *United States v. Johnson*, 337 F.2d 180 (4th Cir.1964). Thus, I have difficulty in concluding that Fuller's defense was affected by any impressions of conduct and credibility of his co-defendant, Kerr, who was also his charged coconspirator under Count I.[16]

For the reasons herein stated, I would grant Kerr's motion for a new trial, and affirm Fuller's conviction.

---

**15.** The only items of challenged evidence touching the guilt or innocence of Fuller pertained to the partnership tax return of the Stereo Den and certain sales tax returns of the Stereo Den. Since these items were properly admitted as evidence to show Fuller's financial difficulties, it is difficult to conclude that, under the limiting instructions of the court, the character evidence against Kerr could affect Fuller.

**16.** Under Count I of the indictment, only Kerr and Fuller were charged as being conspirators. If Kerr should ever be hereafter tried, and found not guilty under Count I, we all recognize that it takes at least two to conspire. However, Fuller would have a remedy under 28 U.S.C. § 2255.